IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In re

ROBERT B. JAFARI AND POOPAK A. JAFARI,

Debtors.

- - - - - - - - - - - - - - - - - - - - - - -

DESERT PALACE INC., d/b/a CAESAR'S PALACE
HOTEL & CASINO,

                          OPINION and ORDER

         Appellant,

                          07-cv-693-bbc

    v.

ROBERT B. JAFARI, POOPAK A. JAFARI
and MARK WITTMAN, Trustee,

         Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WYNN LAS VEGAS, LLC,

         Appellant,

                          07-cv-694-bbc

    v.

ROBERT B. JAFARI, POOPAK A. JAFARI
and MARK WITTMAN, Trustee,

         Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1

Before his substantial debts caught up with him, Robert Jafari lived the life of a high roller. He spent money lavishly, amassing a pair of multi-million dollar homes in Wisconsin and Illinois, a fleet of high-end vehicles and a sufficient reputation at several well-known casinos that they paid to shuttle him from his home in northern Wisconsin to Las Vegas, Nevada. When he was in Las Vegas, the casinos extended him millions of dollars in credit through "markers," with which he gambled and, ultimately lost. When his luck ran out, Jafari filed the Chapter 11 bankruptcy petition that gave rise to the two appeals now before the court.

Several of the casinos, including creditors Wynn Las Vegas LLC and Desert Palace Inc., d/b/a Caesar's Palace, filed notices of claim in the bankruptcy proceeding for credit they had extended to Jafari through these "markers." After engaging in a lengthy evaluation of choice-of-law principles, the bankruptcy court determined that Wisconsin's law, not Nevada's, provides the applicable standard by which the enforceability of the casinos' claims should be evaluated. Citing Wisconsin's Anti-Gaming Statute, Wis. Stat. § 895.055, and common law, the bankruptcy court disallowed the creditors' claims after determining that they were void as against public policy.

The issue presented in these two appeals by creditors Wynn Las Vegas LLC and Desert Palace Inc. is the same (in fact, the parties filed identical briefs in both cases); therefore, I will consider them together.

2

I conclude that under either federal or Wisconsin choice-of-law principles, the substantive law of the state of Nevada, not Wisconsin, governs the validity of creditors' claims against debtors' bankruptcy estate. The bankruptcy court did not consider whether creditors' claims are allowable under Nevada law and the parties have not presented that issue on appeal. The decision of the bankruptcy court will be reversed and the case remanded for further proceedings in conformity with this decision.

As an initial matter, I note that much of debtors' brief is devoted to policy arguments regarding the harmful nature of gambling.[1] They suggest that both equity and sound public policy require the court to invalidate creditors' claims against Jafari's bankruptcy estate. However, it is neither necessary or appropriate for this court to venture into that tangled thicket of moral judgment and public policy. The thorny questions presented in this case relate not to gambling, but to federal and state choice-of-law principles.

From the record on appeal, I find the following facts solely for the purpose of ruling on creditors' appeal.

## FACTS

---

[1] For the purpose of this opinion, I refer to appellees collectively as "debtors." Although I note that appellee trustee Mark Whitman is not a "debtor," there is no reason to draw that distinction in the context of this discussion. When referring to actions of Robert Jafari that are distinct from his role as a debtor, I have used his proper name.

3

A.  Jafari's Financial Circumstances

Robert Jafari was the chief executive officer of a chain of nursing homes. He and his wife Amanda owned a multimillion dollar home in Wayne, Illinois. In 2004, they purchased and moved to a second home in Three Lakes, Wisconsin. They bought expensive cars and art and Jafari invested in extensive real estate holdings. In February 2006, they moved from Wisconsin to Massachusetts (apparently in order for Jafari to receive treatment for compulsive gambling). Although Jafari received a substantial monthly income, his expenses far outstripped his earnings. When he filed a bankruptcy petition on February 6, 2006, Jafari reported a monthly income of approximately $56,000 a month; in March 2006, he reported monthly expenses of more than $85,000.

B.  Gambling Debts

Over an unspecified amount of time prior to 2005, Jafari amassed several million dollars in gambling debt, which he paid off with money lent to him by family friends and his father. However, he continued to gamble. Jafari traveled to Las Vegas and gambled at Wynn Las Vegas at least fourteen times between April 28 and September 26, 2005. (He gambled at Caesar's Palace an unspecified number of times, including during his trip to Las Vegas that began on September 26, 2005.)

As a frequent high stakes gambler, Jafari received numerous perks from the casinos.

4

For example, creditor Wynn Las Vegas gave him $5,000 airfare allowances for trips to Las Vegas on September 2 and 16, 2005. In early 2005, Jafari met Steve Wynn, who gave personal approval for Jafari's initial credit line at his casino in Las Vegas. Each time Jafari gambled, he did so using credit that had been advanced to him by the casino. He repaid all of the advances except those provided to him after September 16, 2005.

On September 17, 2005, Jafari signed a "Credit Agreement" with creditor Wynn Las Vegas LLC. It provided a $150,000 credit line and included the following statement

> I agree that Nevada law exclusively governs the terms of the credit line, advances or credit instruments. I agree that Wynn Las Vegas may litigate any dispute involving the credit line, the debt, or the payee in any Court, State or Federal, in Nevada. I submit to the jurisdiction of any Court, State or Federal, in Nevada.

On September 17, September 19 and September 26, Jafari signed "Credit Line Increase Requests," which contained similar statements regarding selection of Nevada law. Jafari was eventually extended $1,000,000 in credit.

In exchange for the credit, the casinos prepared "markers" for Jafari to sign. "Markers" are similar to post-dated, signed checks and are presented for payment from a gambler's bank account if he is unable to repay the line of credit from his winnings. The Caesar's Palace markers signed by Jafari included a Nevada choice-of-law provision as well.

Markers signed by Jafari in September 2005 were returned unpaid by his bank to creditors Wynn Las Vegas and Caesar's Palace, whereupon those creditors filed a lawsuit

5

in federal court in Nevada seeking to collect from Jafari.

### C. Bankruptcy Filing

On February 6, 2006, two days before his answer was due in the Nevada proceedings, Jafari filed a bankruptcy petition in the United States Bankruptcy Court for the Western District of Wisconsin. The bankruptcy court refused to lift the automatic stay to allow creditors to proceed with their lawsuit in Nevada.

On August 8 and 11, 2006, creditors Caesar's Palace and Wynn Las Vegas filed their proofs of claim with the bankruptcy court. Creditor Wynn Las Vegas submitted a proof of claim for $1,205,178.60, relating to credit advanced to Jafari between September 2 and September 27, 2005. Creditor Caesar's Palace submitted a proof of claim for $250,000, relating to credit advanced between September 25 and 30, 2005. Debtors objected to these claims on the ground that they are unenforceable under Wisconsin law. The bankruptcy court agreed, finding that the claims should be disallowed because they were "unenforceable against the Debtor and property of the Debtor, under any agreement or applicable law."

### OPINION

The question on appeal is whether the bankruptcy court erred in disallowing creditors' proofs of claim for debtor's gambling debts. The bankruptcy code allows creditors

to file claims against the bankruptcy estate. 11 U.S.C. § 501(a). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). Claims are "allowed" unless the debtor objects and the bankruptcy court determines that one of the exceptions outlined in 11 U.S.C. § 502(b) applies. The relevant exception in this case is that a claim is not allowed if it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The bankruptcy court determined that creditors' claims were not allowed because they are "unenforceable" under the applicable law, which it determined was that of the state of Wisconsin.

The threshold issue presented is which choice-of-law rule should be used to determine which state's substantive law should apply. Creditors argue that federal choice-of-law principles should guide the court in a bankruptcy case; debtors argue that the choice-of-law principles of the forum state (here Wisconsin) control.

As a general rule, a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941). This is meant to avoid inconsistent results and intrastate forum-shopping. Id. at 496. However, a federal bankruptcy court is in an unusual position. Its jurisdiction arises

not from diversity, but from federal bankruptcy law, which has a goal of national uniformity, rather than congruence with state law. On the other hand, state law governs the validity of most property rights, and except when the bankruptcy code says otherwise, the bankruptcy court is charged with applying the relevant state law. Butner v. United States, 440 U.S. 48, 54 (1979), In re Wright, 492 F.3d 829, 821-22 (7th Cir. 2007) ("State law determines rights and obligations when the bankruptcy code does not supply a federal rule."). Given this tension, should the bankruptcy court follow federal common law choice-of-law principles, as it would when determining which state's statute of limitation applies in a case brought under a federal statute such as ERISA? E.g., Berger v. AXA Network LLC, 459 F.3d 804, 809-10 (7th Cir. 2006) ("when state law is borrowed in a federal question suit, the choice of which state law to select is itself a question of federal law" (quotation omitted)). Or should the bankruptcy court apply the choice-of-law principles employed by the state in which it sits, as a federal court would in a diversity case? Klaxon Co., 313 U.S. 487.

In Vanston Bondholders Protective Committee v. Green, 329 U.S. 156 (1946), the United States Supreme Court suggested in dicta that bankruptcy courts should apply a federal choice-of-law rule in order to promote uniformity. Id. at 162, 172. In the many years since then, the courts of appeals have taken inconsistent approaches. Compare, e.g., Liberty Tool & Manufacturing. v. Vortex Fishing Systems, Inc. (In re Vortex Fishing Systems, Inc.), 277 F.3d 1057, 1069 (9th Cir. 2002) (requiring use of federal choice-of-law

8

principles), with Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 604-07 (2d Cir. 2001) (discussing split and requiring use of forum state's choice-of-law principles). The Court of Appeals for the Seventh Circuit acknowledged the difficulty presented by this question in Matter of Morris, 30 F.3d 1578, 1581-82 (7th Cir. 1994), but declined to resolve it in the case before it because the federal and forum state choice-of-law principles yielded the same result.

In Morris, the court of appeals characterized the federal choice-of-law approach as one that allows a federal court to "'exercise its independent judgment and choose whatever substantive law it deems appropriate in the context of the case before it.'" Id. at 1582 (quoting Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co., 642 F.2d 744, 748 (5th Cir. 1981) (internal citation omitted)). In Vanston, 329 U.S. at 162, the Supreme Court suggested that this "requir[es] the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states." In this case, the credit agreements were entered into in Nevada, related to gambling in Nevada on several occasions and, but for Jafari's bankruptcy filing, would have been resolved by a Nevada court. That Jafari happened to live in Wisconsin at the time he filed his bankruptcy petition cannot trump these other factors.

However, as in Morris, I need not resolve the question conclusively because the

9

application of a federal common law approach would not produce a result inconsistent with Wisconsin choice-of-law principles. Moreover, debtors do not dispute creditors' argument that, if the federal choice-of-law approach is employed, Nevada substantive law applies. As discussed below, I conclude that Wisconsin choice-of-law principles would produce the identical result.

As the Wisconsin Supreme Court has acknowledged, Wisconsin choice-of-law principles have evolved in confusing ways that are difficult to reconcile. Drinkwater v. American Family Insurance Co., 2006 WI 56, ¶¶33-34, 290 Wis. 2d 642, 714 N.W.2d 568. However, one thing that *is* clear is that different principles control depending on the nature of the case, and that in contract cases, such as this, a court should apply the law of the state with which the contract has its "most significant relationship." State Farm Mutual Automobile Insurance Co. v. Gillette, 2002 WI 31, ¶ 26, 251 Wis. 2d 561, 641 N.W.2d 662 (explaining that "grouping of contacts" rule dictates that "contract rights must be 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship'") (quoting Haines v. Mid-Century Insurance Co., 47 Wis. 2d 442, 177 N.W.2d 328, 330 (Wis. 1970)). Relevant contacts include: (a) the place of the contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the respective domiciles, places of incorporation and places of business of the parties. Sybron Transition Corp. v. Security Insurance Co. of

10

Hartford, 107 F.3d 1250, 1255 (7th Cir. 1997); Haines, 47 Wis. 2d at 446, 177 N.W.2d at 330-31.[2]

The undisputed facts show that Jafari was in Las Vegas when he requested and received the credit-line increases that gave rise to the casinos' claims against him. Thus, the contracts were negotiated and executed in the state of Nevada. Moreover, the casinos do business in Nevada, which was precisely the reason that Jafari traveled there on numerous occasions. Nevada has an interest in insuring that entities that do business and enter into contracts within its borders are able to rely on the bargains they strike. In contrast, Wisconsin's only contact with the contracts was that Jafari happened to live in Wisconsin at the time he entered into the agreements. (This contact was an especially fleeting one: Jafari lived in Wisconsin for a relatively brief time and left the state almost immediately after filing his bankruptcy petition.) Therefore, I conclude that the significant contacts weigh heavily in favor of Nevada, not Wisconsin, and that Nevada law should govern the claims.

Debtor urges the court to move beyond the "grouping of contacts" analysis in this case and consider the five-factor choice-influencing test outlined by the Wisconsin Supreme Court in Heath v. Zellmer, 35 Wis. 2d 578, 151 N.W.2d 664 (1967). This is the test Wisconsin employs in tort cases and cases in which tort and contract law are both relevant,

---

[2] Somewhat curiously, neither party addresses the applicability or relevance of the choice-of-law provisions included in the casinos' contracts. Because they do not discuss the issue, I will not consider it.

Drinkwater, 2006 WI 56, ¶38, 290 Wis. 2d 642, 714 N.W.2d 568, and has, on occasion, applied when a grouping of contacts analysis is inconclusive, Haines, 47 Wis. 2d at 450-51, 177 N.W.2d 328, 332-33.  Because I conclude that the disputed contracts in this case have a far greater relationship to the state of Nevada than Wisconsin, and that Nevada law should therefore govern their enforceability, there is no need to apply the Heath factors as a tie-breaker.

The parties have not discussed and I need not decide what Nevada law would make of the contracts between Jafari and the casinos.  Although I suspect the contracts would be deemed valid claims, I will leave the ultimate determination to the bankruptcy court.

ORDER

IT IS ORDERED that the decision of the United States Bankruptcy Court for the Western District of Wisconsin to disallow the proofs of claim of creditors Wynn Las Vegas LLC and Desert Palace Inc., d/b/a Caesar's Palace, is REVERSED.  This case is REMANDED

to the bankruptcy court for additional proceedings in conformity with this opinion.

Entered this 7th day of April, 2008.

                        BY THE COURT:

                        /s/

                        _____
                        BARBARA B. CRABB
                        District Judge